# UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

CURTIS L. SHORE,              :
                             :
        Plaintiff           :
                             :          No. 3:12-CV-00441
    vs.                     :
                             :          (Judge Nealon)
CAROLYN W. COLVIN, ACTING    :
COMMISSIONER OF SOCIAL       :
SECURITY,                    :
                             :
        Defendant           :

**FILED**
**SCRANTON**

SEP 2 7 2013

PER _____ DEPUTY CLERK

## MEMORANDUM

## Background

      The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Curtis L. Shore's claim for social security disability insurance benefits.

      Shore protectively filed[1] an application for disability insurance benefits on November 17, 2009. Tr. 11, 27, 155-161, 169 and 179.[2]  On June 1, 2010, the Bureau of Disability Determination[3] denied Shore's application. Tr. 86-90.  On July 14,

---

1.  Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

2.  References to "Tr.__" are to pages of the administrative record filed by the Defendant as part of the Answer on May 7, 2012.

3.  The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security

(continued...)

2010, Shore requested a hearing before an administrative law judge. Tr. 11 and 91-92. After 12 months had passed, a hearing was held on July 13, 2011. Tr. 11 and 25-83. On July 21, 2011, the administrative law judge issued a decision denying Shore's application. Tr. 11-20. On August 9, 2011, Shore filed a request for review with the Appeals Council and on February 2, 2012, the Appeals Council concluded that there was no basis to grant Shore's request for review. Tr. 1-7.

Shore then filed a complaint in this court on March 9, 2012. Supporting and opposing briefs were submitted and the appeal[4] became ripe for disposition on July 30, 2012, when Shore filed a reply brief.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." It is undisputed that Shore met the insured status requirements of the Social Security Act through December 31, 2013. Tr. 11, 13, 179, 222 and 240.

---

3. (...continued)
Administration. Tr. 87

4. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D.Pa. Local Rule 83.40.1.

Shore was born in the United States on October 22, 1971, and at all times relevant to this matter was considered a "younger individual"[5] whose age would not seriously impact his ability to adjust to other work. 20 C.F.R. § 404.1563(c). Tr. 31, 84, 155 and 169.

Shore graduated from high school in 1990 and can read, write, speak and understand the English language and perform basic mathematical functions such as paying bills, counting change, handling a savings account and using a checkbook and money orders. Tr. 39, 195 and 215. During his elementary and secondary schooling, Shore attended regular education classes. Tr. 37 and 202. After high school, Shore did not attend college, trade school or any type of special job training. Id.

The record reveals that Shore worked full-time as a welder for Kidde Industries, Inc., Greencastle, Pennsylvania, in 1995, 1996 and 1997 and as a laborer and welder for Mellott Company, Warfordsburg, Pennsylvania, in 1997 and 1998. Tr. 172, 204 and 231. He also worked full-time as a welder for JLG Industries, Inc., McConnellsburg, Pennsylvania, in 1999. Tr. 175-176, 204 and 229.

---

5. The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).

Shore was involved in a motorcycle accident sometime in August, 1999, which caused serious trauma to his right leg. Tr. 47-48 and 245. After the accident, there was an attempt to save the right leg but Shore developed gangrene and the leg was amputated on August 21, 1999, above the knee about 4 inches from the groin area. Id.; Tr. 47, 326 and 339. Shore testified at the administrative hearing that after the amputation he was fitted with a prosthetic leg in October, 1999, and that he was "finished with [physical] therapy right before Christmas of the same year." Tr. 47. After Shore was fitted with a prosthetic device and completed physical therapy, he continued to work on a full-time basis as a welder up until February, 2009. Tr. 204 and 206. In addition to working full-time as a welder, he also worked in 2006 and 2007 as a driver for Fulton County Partnership, Inc., McConnellsburg. Tr. 174-175 and 229.

Shore claims he became disabled on February 14, 2009,[6] as the result of increasing pain associated with the loss of his right leg. Tr. 11, 27, 155 and 179. The pain manifests itself as

---

6. The record reveals that in February, 2009, Shore's employer laid him off. Tr. 32.

phantom limb pain syndrome[7] and chronic low back pain, i.e.,
lumbago. Id.; Doc. 6, Plaintiff's Brief, p. 1.

About five months after the alleged onset date of
February 14, 2009, Shore commenced working again as a driver for
Fulton County Partnership. Tr. 204-205. Shore drives
"elderly/needy" individuals to "doctor appointments." Id. Shore
claims he can only work on a part-time basis as a driver but
testified at the administrative hearing that there are days where
he works up to nine hours.[8] Tr. 62-63. With regard to Shore's
claim that he is limited to part-time work, the following exchange
occurred between Shore and the ALJ at the hearing on July 13,
2011:

---

7. The Mayo Clinic website described phantom pain as

> pain that feels like it's coming from a body part
> that's no longer there. Doctors once believed this
> post-amputation phenomenon was a psychological
> problem, but experts now recognize that these real
> sensations originate in the spinal cord and brain.

> Although phantom pain occurs most often in people
> who've had an arm or leg removed, the disorder may
> also occur after surgeries to remove other body
> parts . . . .

> For some people, phantom pain gets better over time
> without treatment. For others, managing phantom
> pain can be challenging.

Phantom pain, Definition, Mayo Clinic staff, Mayo Clinic,
http://www.mayoclinic.com/health/phantom-pain/DS00444 (Last
accessed September 26, 2013).

8. At the administrative hearing Shore testified that he worked
4 to 5 days per week, 4 to 9 hours per day and that an average
day was 5 to 7 hours. Tr. 62 and 65-66.

Q. I know that you believe you're able to work, because you are working. So, let's ask it a different way. Do you believe you're able to work full-time, 40 hours a week or more?

A. No, ma'am.

Q. Why not?

A. The pain's so bad right now. I can't even concentrate and focus on anything in particular. All I can focus on during the day is [when] I'm going to get home so I can take my leg off.

Q. Well, sir, you are driving the elderly and the disabled, and are you telling me that while you're driving the elderly and the disabled, you can't concentrate?

A. Not very much. I mean, I can do my job. I can – I know where I'm going. Usually, we go to the same places. I just go where we're going and come back home. All I'm thinking about is what time I'm going to get home.

Tr. 63-64. Also, in one document filed with the Social security Administration, Shore stated with respect to the time frame 2007 to the "present"[9] that he works from 25 to 30 hours per week and that "sometimes" he "has to help individuals in and out of the van." Tr. 229. A review of Shore's actual payroll records from Fulton County Partnership reveals that Shore over a 24 month period (July, 2009, through June, 2011) worked 2297.75 hours which equals approximately 22 hours per week.[10] Tr. 162-166 and 177-178.

9. The document is not dated but we can discern that it was completed after July 14, 2010, because in the body of the document it is stated that the last time Shore's case file was updated was July 14, 2010. Tr. 229.

10. 2297.75/24=95.739 (total hours divided by number of months
(continued...)

6

A vocational expert testified that Shore has past relevant employment[11] as (1) a welder which was described as unskilled, medium work and (2) a van driver which was described as semi-skilled, medium work as generally performed in the economy but light work as actually performed by Shore.[12] Tr. 73-74 and 238.

---

10. (...continued)
equals number of hours per month)
    95.739/4.3 = 22.264 (number of hours per month divided by the number of weeks in a month equals number of hours per week)

11. Past relevant employment in the present case means work performed by Shore during the 15 years prior to the date his claim for disability was adjudicated by the Commissioner. 20 C.F.R. §§ 404.1560 and 404.1565.

12. The terms sedentary, light and medium work are defined in the regulations of the Social Security Administration as follows:

> (a) *Sedentary work.* Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

> (b) *Light work.* Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.
> (continued...)

7

Shore had earnings in the years 1986 through 2011 ranging from a low of $1322.50 in 1987 to high of $41,215.79 in 2008. Tr. 171. Shore's total earnings during the years 1986 through 2009 were $428,440.54. Id. Also, the payroll records from Fulton County Partnership reveal that Shore earned $8796.58 in 2010 and $6272.17 during the first half of 2011. Tr. 162-166 and 177-178.

Although Shore claims that he has been disabled and unable to work full-time since February 14, 2009, the record reveals that Shore applied for and received unemployment compensation benefits during the second and third quarters of 2009 in the amounts of $7784.00 and $3892.00, and during the first, second and third quarters of 2010 in the amounts of $1299.00, $5038.00 and $2620.00, respectively.[13] Tr. 167-168.

---

12. (...continued)
> (c) *Medium work*. Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can do sedentary and light work.

20 C.F.R. § 404.1567.

13. An individual can only collect unemployment compensation if the individual is able and willing to accept work. 43 P.S. §801(d)(1). The Pennsylvania Department of Labor and Industry published a handbook in 2010 (UCP-1 REV 12-10) which indicates that to be eligible for unemployment compensation a claimant must file timely biweekly claims for the weeks that the claimant is unemployed. The handbook further indicates that a claimant is ineligible if the claimant limits the number of hours he or she

(continued...)

For the reasons set forth below, the Court will affirm the decision of the Commissioner denying Shore's applications for disability insurance benefits.

## Standard of Review

When considering a social security appeal, the Court has plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, the Court's review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is

---

13.    (...continued)
works when there is additional work available. With respect to part-time work, a claimant can be eligible for benefits under the following circumstances: (1) the claimant's regular hours are reduced because of lack of work; (2) the claimant is separated from his or her job and has obtained other employment with fewer hours of work; and (3) the claimant separated from one job but continues to have part-time employment with another employer. The handbook also indicates that a claimant is ineligible if the claimant refuses a referral to a job opportunity or is unable to work because of illness or disability. Pennsylvania Unemployment Compensation Handbook, Pennsylvania Department of Labor & Industry, Office of Unemployment Compensation Benefits, http:// www.lancasterlibraries.org/lslc/lib/lslc/biz_pdfs/pennsylvania_un employment_compensation_handbook.pdf (Last accessed December 14, 2012).

The record reveals that Shore received unemployment compensation benefits from early 2009 to February 2011. Tr. 34. At the time of the administrative hearing Shore was no longer receiving unemployment benefits because the benefits were "exhausted." Id. When initially questioned by the ALJ about receiving unemployment compensation benefits Shore testified that he told the unemployment compensation office that he was able to work and then only at a later point during the questioning by the ALJ clarified that he only told them that he was working 20 to 25 hours per week and he could only accept part-time work. Tr. 33-35.

to determine whether those findings are supported by "substantial evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record substantial evidence may be "something less than the weight

10

of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

**Sequential Evaluation Process**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or

11

which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income claims. See 20 C.F.R. §404.1520; Poulos, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[14] (2) has an impairment that is severe or a combination

_____

14. If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit." 20 C.F.R. § 404.1510.

of impairments that is severe,[15] (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment,[16] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. _Id_. As part

---

15. The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 404.1520(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. _Id._ If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. § 404.1520(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process. 20 C.F.R. §§ 404.1523 and 404.1545(a)(2). An impairment significantly limits a claimant's physical or mental abilities when its effect on the claimant to perform basic work activities is more than slight or minimal. Basic work activities include the ability to walk, stand, sit, lift, carry, push, pull, reach, climb, crawl, and handle. 20 C.F.R. § 404.1545(b). An individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and respond appropriately to supervision, coworkers and work pressures. 20 C.F.R. § 1545(c).

16. If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step.

of step four, the administrative law judge must determine the claimant's residual functional capacity. Id.[17]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id; 20 C.F.R. § 404.1545; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**Medical Records**

The administrative record in this case is 379 pages in length and we have thoroughly reviewed that record. Before the Court addresses the administrative law judge's decision and the arguments of counsel, the medical records will be reviewed in detail. The alleged disability onset date in this case is February 14, 2009. The relevant time period for review of medical

---

17. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

14 ·

records is generally the alleged disability onset date to the date the administrative law judge issued his or her decision and the Court's task is to focus on the records before the administrative law judge. In this case, however, for background purposes the Court will commence with medical records that predate the alleged disability onset date.

On October 10, 2005, Shore had a neurosurgical consultation with Stanton E. Sollenberger, D.O., regarding a 6-week history of episodic vertigo.[18] Tr. 245-246. Dr. Sollenberger reported that Shore was taking Neurontin[19] 800 mg three times per day "for phantom limb pain which he has been plagued with since losing his [right lower extremity]." Tr. 245. Dr. Sollenberger further noted that Shore was taking no other medications, denied allergies, smoked 1 ½ packs of cigarettes per day and was working as a welder for JLG Industries, Inc. Id. An examination of Shore

18. Vertigo is defined as "an illusory sense that either the environment or one's body is revolving; it may result from diseases of the internal ear or may be due to disturbances of the vestibular centers or pathways in the central nervous system. The term is sometimes erroneously used to mean any form of dizziness." Dorland's Illustrated Medical Dictionary, 2051 (32nd Ed. 2012).

19. Neurontin, generic name gabapentin, "is an anti-epileptic medications . . . used alone or in combination with other medications to treat seizures . . . [It] is also used in adults to treat nerve pain caused by herpes virus or shingles . . . [and] may also be used for [other] purposes[.]" Neurontin, Drugs.com, http://www.drugs.com/neurontin.html (Last accessed September 25, 2013).

15

by Dr. Sollenberger revealed that Shore was in no acute distress; his mental status was intact; he had normal muscular bulk, tone and power throughout; he had diminished sensation on the left side of his face and body; he had increased reflexes on the left upper extremity compared to the right; and his left lower extremity reflexes were brisk but Dr. Sollenberger noted he "had nothing to compare them to." Id. After performing the examination, Dr. Sollenberger was "not sure of an explanation for [Shore's] episodic vertigo." Tr. 246. Dr. Sollenberger ordered blood tests and an Electroencephalogram (EEG) and prescribed the drug Carbatrol[20] 250 mg every twelve hours. Id. The EEG was performed on October 17, 2005, and was interpreted by Dr. Sollenberger as being "abnormal [because of] the presence of focal paroxysmal slowing [] in the left temporal region occasionally" and "sleep apnea was identified during the sleep portion of the record." Tr. 247. After the EEG performed in 2005,[21] the administrative record does not reveal that Shore had any further contact with Dr. Sollenberger and the next record encountered is from 2008.

---

20.  Carbamazepine (brand name Carbatrol) "is an anticonvulsant . . . used to treat seizures and nerve pain[.]" Carbamezepine, Drugs.com, http://www.drugs.com/carbamazepine.html (Last accessed September 25, 2013).

21.  In 2005 Shore was working full-time as a welder and earned $30,334.57; in 2006 $34,951.21; and in 2007 $34,631.51.

16

On January 29, 2008, Shore received treatment at Tri-State Community Health Center, located in McConnellsburg, Pennsylvania, for bronchitis. Tr. 277-278. The signature of the individual who examined Shore is illegible[22] and the physical examination findings are unremarkable other than with respect to the respiratory problem. Id. Shore was prescribed the antibiotic Keflex (generic cephalexin) 500 mg three times per day. Tr. 278.

On March 4, 2008, Shore received treatment at Tri-State Community Health Center for a sinus condition. Tr. 258-259. The signature of the individual who examined Shore is illegible[23] and the physical examination findings are unremarkable other than with respect to the sinus problem. Id. Shore was prescribed the antibiotic Keflex 500 mg three times per day. Tr. 259.

On April 14, 2008, Shore had an appointment at Tri-State Community Health Center at which he complained of phantom pain from the amputated right leg that was getting worse. Tr. 256. The signature of the individual who examined Shore is illegible but it can be discerned that it was a certified physician assistant. Tr.

22. When the medical records were requested from Tri-State Community Health Center the request was mailed to Joanna M. Brady, M.D. Tr. 248. The signature on the record of the January 29th appointment does not appear to be that of Dr. Brady. Tr. 278.

23. The signature on the record of the March 4th appointment appears to be the same as the one on the record of the January 29th appointment.

257.  When the physician assistant reviewed Shore's systems,[24] Shore denied extremity weakness, numbness and abnormal sensation; he denied joint redness and swelling; and he denied fever, chills, nausea and vomiting. Tr. 256.  A physical examination revealed "[negative] pain at [the] amputation site." Id.  Shore was prescribed the medication Lyrica[25] 500 mg three times per day and it was noted that Shore would be weaned off of Neurontin. Tr. 257. Shore was also referred to a neurologist. Id.

On April 17, 2008, Shore had an appointment at Parkway Neuroscience and Spine Institute, Hagerstown, Maryland. Tr. 336-338.  Shore was interviewed and examined by Melissa J. Short, a certified physician assistant, employed by Julie T. Hoang, M.D. Tr. 338.  There is no indication that Dr. Hoang examined Shore on April 17th but that she reviewed and approved the history and physical notes and findings of Ms. Short on April 21, 2008. Tr. 338.  At the appointment on April 17th Shore complained of

---

24.  "The review of systems (or symptoms) is a list of questions, arranged by organ system, designed to uncover dysfunction and disease." A Practical Guide to Clinical Medicine, University of California, School of Medicine, San Diego, http://meded.ucsd.edu/ clinicalmed/ros.htm (Last accessed November 6, 2012).

25.  Lyrica (generic name pregabalin) "is used to control seizures and to treat fibromyalgia.  It is also used to treat pain caused by nerve damage in people with diabetes . . . [It] may also be used for other purposes[.]" Lyrica, Drugs.com, http://www.drugs.com/lyrica.html (Last accessed September 26, 2013).

worsening phantom right leg pain. Tr. 336. Shore also complained of bothersome back pain that started about 1 ½ years prior to the April 17th appointment. Id. Shore rated his pain as an 8 on a scale of 1 to 10 and described it as sharp and constant. Id. Shore noted that he was unable to sleep, he was taking Neurontin and Lyrica, and that he was taking large doses of Tylenol PM and had tried Elavil and Ambien but still could not sleep. Id. Shore further stated that he was smoking 1 ½ packs of cigarettes per days for 26 years, his consumption of alcohol was moderate and he continued to work as a welder.[26] Id.

When Ms. Short reviewed Shore's systems, Shore complained of hearing loss and ringing in his right ear, back and neck pain, and incoordination and leg pain with walking. Tr. 337. He had no muscle cramps, arm weakness, arm pain, leg weakness, left leg pain, neck stiffness, decreased memory, difficulty speaking, dizziness, fainting, headaches, weakness in extremities, anxiety, depression or inability to concentrate. Id. The results of a physical examination were normal other than the following: his gait was stiff and he used a cane; he had moderate tenderness in the area of the lumbosacral spine along with spasm and tautness. Id. It was noted that Shore had normal attention span,

_____

26. As noted earlier in this memorandum, in 2008 Shore earned $41,215.79.

concentration, affect, speech, thought content, perception and cognitive function. Id. Shore had normal sensation to touch and normal bulk and tone of his muscles. Id. Shore had normal strength in all muscles and normal reflexes and negative Babinski and straight leg raising tests. Id. Ms. Short's diagnostic impression was that Shore suffered from lumbago (low back pain) and phantom limb syndrome. Tr. 338. She noted that his back pain was "in large part [the result of] the way he walks." Id. Ms. Short continued Shore's prescription for Lyrica, increased his dosage of Neurontin and prescribed the drug Lunesta to help him sleep. Id.

On May 1, 2008, Shore had an appointment with Dr. Hoang at which Shore reported that he had no improvement in his symptoms and that he missed two days of work because of poor sleep. Tr. 333-334. He further reported that his pain was an 8 on a scale of 1 to 10, sharp and that it was worse when in a prone position. Id. There was no change from what was reported on April 17th with respect to the review of Shore's systems and physical examination findings. Id. Dr. Hoang's diagnostic assessment was that Shore suffered from lumbago, phantom limb syndrome and myalgia/myositis,[27] and continued the prescription for Neurontin

---

27. Myalgia is defined as muscle pain and myositis as muscle inflammation. See Dorland's Illustrated Medical Dictionary, 1214
(continued...)

20

and prescribed the drugs morphine sulfate, Voltaren[28] and Topamax.[29] Id.

At an appointment with Dr. Hoang on May 16, 2008, Shore reported an improvement in his condition. Tr. 331-332. Shore stated that his pain was an 8 to 9 on a scale of 1 to 10. Id. Dr. Hoang's review of systems findings were essentially the same as those reported on April 17th. Id. No abnormal physical examination findings were reported other than Shore was limping, stiff and using a cane. Id. Dr. Hoang's diagnostic assessment was the same and she decreased Shore's dosage of morphine. Id.

On June 12, 2008, Shore told Dr. Hoang that his pain was a 6 to 8 on a scale of 1 to 10 and that he had a second job. Tr 329. Shore requested an increase in his dosage of morphine. Id. Dr. Hoang's review of systems finding were essentially the same as those reported on April 17th. Id. No abnormal physical examination findings were reported other than Shore was limping, stiff and

_____

27. (...continued)
& 1225 (32nd Ed. 2012).

28. Voltaren (generic diclofenac) is a nonsteroidal anti-inflammatory drug used to treat pain or inflammation. See Voltaren, Drugs.com, http://www.drugs.com/voltaren.html (Last accessed September 26, 2013).

29. Topamax is used to treat seizures and headaches but can also be used for other purposes. See Topamax, Drugs.com, http://www. drugs.com/topamax.html (Last accessed September 26, 2013).

using a cane. Id. There was no change in Dr. Hoang's diagnostic assessment and she increased his dosage of morphine. Id.

On June 17 and 18, 2008, Shore was examined and treated at Tri-State Community Health Center for complaints of abdominal pain which was diagnosed as being caused by a partial small bowel obstruction.[30] Tr. 252-255. On June 18th Shore stated that his abdominal pain had decreased. Tr. 252. Shore was instructed to call for another appointment if his symptoms worsened. Tr. 253.

On July 10, August 12, September 2, October 7 and 15, and November 10 and 25, 2008, and January 7 and February 18, 2009,[31] Shore had appointments with Dr. Hoang. Tr. 306-328. Dr. Hoang's review of systems findings at each of these appointments were essentially the same as those made on April 17th. Id. No abnormal physical examination findings were reported other than Shore was limping and stiff. Id. Dr. Hoang did not indicate that Shore was using a cane to ambulate. Id. Dr. Hoang did not record Shore's pain level on a scale of 1 to 10. Id. There was no change in Dr. Hoang's diagnostic assessment at each of these appointments

30. Shore was also treated at Tri-State Community Health Center on November 26, 2008, for a left foot rash. Tr. 250-251. The record of this appointment is unrevealing as to the state of Shore's phantom leg pain and low back pain.

31. February 18th was the first appointment Shore had with Dr. Hoang after the alleged disability onset date of February 14, 2009.

22

other than on November 10, 2008, when she stated that Shore was suffering only from phantom leg syndrome and lumbago. Id. Dr. Hoang continued to treat Shore with pain medications. Id.

At an appointment with Dr. Hoang on March 18, 2009, Shore reported that he had pain which he rated as an 8-10 on a scale of 1 to 10 which was worse with standing and better with sleeping. Tr. 303. Shore described his leg pain[32] as sharp and his back pain as dull. Id. It was noted that Shore was "off his neurontin for 3 days and had to take 4 tabs of Oxycontin[33] for pain" and that he was "not currently working because he was laid off." Id. The review of systems findings were essentially the same as those initially reported in April, 2008. Id. The physical examination findings were also unchanged. Id. There was no indication that Shore was using a cane or that there was any irritation, swelling or redness on the stump of the amputated right leg. Id. Dr. Hoang's diagnostic impression was the same and she continued to treat Shore with pain medications. Id.

---

32. The record refers to "leg pain" which we assume based on a review of the prior medical records was actually phantom leg pain from the amputated right leg.

33. Oxycontin is a narcotic, opiod pain reliever similar to morphine use to treat moderate to severe pain. Oxycontin, Drugs.com, http://www.drugs.com/oxycontin.html (Last accessed September 26, 2013).

On April 29, 2009, Shore had an appointment with Dr. Hoang regarding his leg pain. Tr. 301-302. It was noted that Shore's symptoms were unchanged. Id. Dr. Hoang did not record any review of systems or physical examination findings. Id. Dr. Hoang's diagnostic assessment was the same and she continued to prescribe pain medications. Tr. 302. Dr. Hoang did make the following notation in the medical record of this appointment: "Stable on pain medications. 2, one month refills were provided for the patient. He is compliant on med count at today's visit. The patient continues to benefit from opiod management for pain. The patient has failed conservative treatment. The medication decreases symptoms, improves function and quality of life. The patient accepts the responsibilities with the use of opiods. Continue Neurontin. Renew Voltaren. Follow-up in 9 weeks for refill." Id.

On July 1, 2009, Shore had an appointment with Dr. Hoang regarding his leg pain. Tr. 299. It was noted in the record of this appointment that Shore continued to take Oxycontin and Neurontin and that he rated his pain as an 8 on a scale of 1 to 10 which was worse with standing and better with sleeping. Id. The pain was described as sharp in the leg and dull in the back. Id. Dr. Hoang did not record any review of systems or physical examination findings. Id. The diagnostic assessment was that

Shore suffered from phantom limb syndrome and lumbago which was a change from the previous diagnostic assessments that included a finding that Shore suffered from myalgia and myositis. Id. Dr. Hoang continued to prescribe pain medications. Id.

Shore had appointments with Dr. Hoang on September 30, November 2, and December 21, 2009, and March 15, 2010. Tr. 293-298 and 361 and 362. At the appointment on September 30 and December 21, 2009, Dr. Hoang's diagnostic assessment was lumbago and phantom limb syndrome; at the appointment on November 2, 2009, the diagnostic assessment was phantom limb syndrome, lumbago and myalgia/myositis; and at the appointment on March 15, 2010, the diagnostic assessment was phantom limb syndrome. Id. Dr. Hoang did not record any review of systems or physical examination finding at any of these appointments. Id.

At the appointment on September 30, 2009, Shore reported improvement in symptoms with Oxycontin and Neurontin. Tr. 297. At the appointment on November 2, 2009, Shore reported that his pain was a 10 on a scale of 1 to 10. Tr. 295. At the appointment on December 21, 2009, Shore reported that his symptoms were worsening. Tr. 293. However, he indicated that his pain level was an 8-9 on a scale of 1 to 10 and that he was comfortable standing and sleeping. Id. Also, at the appointment on December 21st Shore denied any side effects from the pain medications he was taking.

Id. Shore at the appointment on March 15, 2010, reported that his pain level was a 10 but he also reported improvement in his "function" on opiods and that he continued to work. Tr. 361.

On April 22, 2010, Shore was examined by Mohamad Haq, M.D., on behalf of the Bureau of Disability Determination. Tr. 339-350. Dr. Haq noted that Shore's left leg was normal, including a normal range of motion; his right leg amputation with a stump appeared to be well healed and looked healthy; his groin area appeared healthy although Dr. Haq noted some irritation with slight erythema on the right side; Shore's deep tendon reflexes were present bilaterally; Shore had mild decreased grip strength on the right hand and decreased range of motion at the wrist and some mild degree of generalized muscle wasting; Shore used a prosthetic leg on the right and walked with a prominent limp; a straight leg raise test on the left was normal; and Shore was able to use both hands effectively without any problem. Id. Dr. Haq opined that Shore could frequently lift and carry 2-3 pounds; Shore could occasionally lift 10 pounds; he could stand and walk 1 hour or less in an 8 hour workday; he could sit 4 hours in an 8 hour workday; he was limited in pushing and pulling with his extremities; he could occasionally bend and balance, but never kneel, stoop, crouch, or climb; and his impairments were affected by vibration, temperature extremes, wetness, and humidity. Id.

On June 1, 2010, Gordon C. Arnold, M.D., reviewed Shore's medical records and Dr. Haq's report on behalf of the Bureau of Disability Determination and completed an assessment of Shore's work-related physical functional abilities. Tr. 351-358. Dr. Arnold found that Shore could lift/carry 20 pounds occasionally and 10 pounds frequently; Shore could stand and/or walk 2 hours in an 8-hour workday; he could sit about 6 hours in an 8-hour workday; he required the use of a cane for ambulation; he was limited in his ability to push and/or pull with his right lower extremity; he could only occasionally use ramps and climb stairs; he could never climb ladders, ropes or scaffolds; he could occasionally balance and stoop; he could never kneel, crouch, or crawl; and he should avoid concentrated exposure to extreme heat and cold, wetness, humidity, vibration, and hazards. Id.

On June 14, 2010, Shore had an appointment with Dr. Hoang regarding his leg pain. Tr. 359-360. The record of this appointment does not contain any review of systems findings. Id. Furthermore, Dr. Hoang did not record any physical examination findings other than Shore was alert, cooperative with no acute distress; oriented to person, place and time; well-nourished and well-developed; and he had a normal posture but his gait was stiff and he was limping with a right-leg prosthesis. Id. There was no indication that Shore had swelling, redness or irritation at the

stump of the amputated right leg. Id. Dr. Hoang's diagnostic assessment was that Shore suffered from phantom limb syndrome and lumbago and she continued to prescribe pain medications and noted that the medications decrease symptoms, and improve function and the quality of Shore's life. Id.

On July 14, 2010, Shore had an appointment with Dr. Brady at which he complained of a lot of pain, including pain in his left knee and hip.[34] Tr. 372-373. Shore told Dr. Brady that he was able to walk but that he no longer could "work a full eight-to-ten-hour day . . . because of pain." Tr. 372. The results of a physical examination were essentially normal other than Dr. Brady noted that Shore walked "very stiff-legged despite having the artificial limb" and that he had "an antalgic gait" and "some clicks noted of the knee and early osteoarthritic changes noted of the knee." Tr. 373. On the same day, Dr. Brady filled out a disability form for Shore in which she stated that Shore was permanently disabled from any gainful employment.[35] Tr. 364.

---

34. From the Court's review of the medical records, this appears to be the first time Shore complained of pain in his left hip and knee.

35. The record reveals that Shore worked as a van driver for Fulton County Partnership, Inc., a total of 98.25 hours during July, 2010; 70.75 hours during August, 2010; 82.75 hours during September, 2010; 98.75 hours during October, 2010. Tr. 165.

On August 18, 2010, Shore had an appointment with Dr. Hoang regarding his leg pain. Tr. 377-378. The record of this appointment does not contain any review of systems findings. Id. Furthermore, Dr. Hoang did not record any physical examination findings other than Shore was alert, cooperative with no acute distress; oriented to person, place and time; well-nourished and well-developed; and Shore had a normal posture but his gait was stiff and he was limping with a right-leg prosthesis. Id. There was no indication that Shore had swelling, redness or irritation at the stump of the amputated right leg. Id. There was no report of Shore having a problem with his left hip or knee. Id. Dr. Hoang's diagnostic assessment was that Shore suffered from phantom limb syndrome and lumbago and she continued to prescribe pain medications and noted that the medications decrease symptoms, and improve function and the quality of Shore's life. Id.

On October 22, 2010, Shore had an appointment with Dr. Brady "to have disability forms filled out and to be checked." Tr. 371. The only objective findings recorded by Dr. Brady were as follows: "Blood pressure 136/88. Weight 133. Pulse 84 and Temperature 97.7. In general appears to be in no acute distress. Mucous membranes are moist without erythema, exudates or lesions. Heart is regular, rate rhythm without murmurs, rubs or gallops. Lungs are clear to auscultation bilaterally. Abdomen soft,

nontender, nondistended with normal active bowel sounds.
Extremities no clubbing, cyanosis or edema of left, right is
amputated." Id. Dr. Brady did not report any redness, swelling or
irritation at the stump of the amputated right leg. Id. Dr.
Brady's assessment was as follows: "Right amputated leg associated
with comorbidities including ambulatory dysfunction and low back
pain and weakness of what is left of the right femur muscles" Id.
It was noted that Shore refused physical therapy. Id.

Also, on October 22, 2010, Dr. Brady completed a
document on behalf of Shore entitled "Functional Capacity
Assessment." Tr. 365-369. The document addressed Shore's
functional abilities during an 8-hour workday. Id. In that
document Dr. Brady stated, inter alia, that Shore could only
occasionally lift/carry 10 pounds and frequently lift/carry less
than 10 pounds as a result of his right leg amputation; Shore had
no ability to stand and/or walk as a result of his right leg
amputation;[36] Shore could only sit less than 2 hours; Shore must
periodically alternate sitting and standing to relieve pain or
discomfort; Shore would "need to lie down" 4-6 hours during an 8-

_____

36. Dr. Brady's statement that Shore had no ability to stand or
walk during an 8-hour workday is inconsistent with her statement
that Shore could occasionally lift and carry 10 pounds during an
8-hour workday. "Occasionally" is defined on the form completed
by Dr. Brady as 2-3 cumulative hours in an 8-hour workday. Tr.
365.

hour work shift; Shore could never climb, balance, stoop, kneel, crouch, crawl, bend or twist; Shore had no side effects from his medications; and Shore was incapable of engaging in any work.[37] Id.

On November 24, 2010, Shore had an appointment with Dr. Hoang regarding his leg pain. Tr. 375-376. The record of this appointment does not contain any review of systems findings. Id. Furthermore, Dr. Hoang did not record any physical examination findings other than Shore was alert, cooperative with no acute distress; oriented to person, place and time; well-nourished and well-developed; and he had a normal posture but his gait was stiff and he was limping with a right-leg prosthesis. Id. There was no indication that Shore had swelling, redness or irritation at the stump of the amputated right leg. Id. There was no report of Shore having a problem with his left hip or knee. Id. Dr. Hoang's diagnostic assessment was that Shore suffered from phantom limb syndrome and lumbago and she continued to prescribe pain medications and noted that the medications decrease symptoms, improve function and the quality of Shore's life. Id.

On March 2, 2011, Shore had an appointment with Dr. Brady "for medication refills." Tr. 379. Dr. Brady did not record

---

37. The record reveals that Shore worked 98.75 hours as a van driver in October, 2010; 87 hours in November, 2010; 139.25 hours in December, 2010; 314.25 hours in January through March, 2011; 107.75 hours in April, 2011; 111.75 hours in May, 2011; and 169.5 hours in June, 2011. Tr. 165-166 and 177-178.

any objective findings relating to Shore's work-related functional abilities. Id. Shore told Dr. Brady that he takes his pain medications as prescribed and that "overall he [was] doing quite well." Id.

## Discussion

The administrative law judge at step one of the sequential evaluation process found that Shore had engaged in substantial gainful activity during November and December, 2009 but that after averaging Shore's earnings his work activity did not rise to the level of substantial gainful activity and there was a 12-month period during which he did not engage in substantial gainful activity. Tr. 13.

At step two of the sequential evaluation process, the administrative law judge found that Shore has the following severe impairments: "status post above knee amputation of the right lower extremity; Phantom Pain Syndrome; [and] lumbago [.]" Id.

At step three of the sequential evaluation process, the administrative law judge found that Shore's impairments did not individually or in combination meet or equal a listed impairment, including Listing 1.05, Amputation (due to any cause). Tr. 14.

At step four of the sequential evaluation process, the administrative law judge found that Shore can not perform his past relevant work but that he had the residual functional capacity to

perform a limited range of sedentary work. Tr. 14 and 18.

Specifically, the administrative law judge stated that Shore could

engage in full-time sedentary work as defined in the regulations

which allowed

> for normal breaks consisting of 15 minutes in the
> morning and afternoon and a 30 minute break for lunch,
> along with, occasional short bathroom breaks; must not
> involve the use of foot/leg pedals or levers with
> the right lower extremity, with the exception
> of pressing buttons or knobs; must not require climbing
> stairs, ropes, ladders, scaffolding or poles; must not
> involve more than occasional balancing; must not involve
> kneeling, crouching, squatting or crawling; must be
> able to avoid exposure to extreme cold, extreme heat,
> extreme humidity and concentrated exposure to wet/
> water/liquids; must be able to avoid working around
> loud and very loud noise; must not require working
> around vibrating objects or surfaces; must not involve
> working in high exposed places or around fast moving
> machinery on the ground, and must not involve working
> around/with sharp objects or toxic or caustic chemicals.

Tr. 14-15. In setting this residual functional capacity, the

administrative law judge found that Shore's medically determinable

physical impairments could reasonably be expected to cause his

alleged symptoms but that his statements concerning the intensity,

persistence and limiting effects of those symptoms were not

credible to the extent they were inconsistent with the ability to

perform work consistent with the above-stated residual functional

capacity. Tr. 15. The administrative law judge also relied on the

opinion of Dr. Arnold who found that Shore could engage in light

work. Tr. 17. However, the ALJ gave Shore the benefit of the

doubt and reduced his functional ability to the sedentary level. The ALJ furthermore rejected the opinion of Dr. Haq, who _inter alia_ found that Shore could only sit 4 hours and stand 1 hour or less in an 8-hour workday, as an overestimate of Shore's limitations with respect to sitting, standing and walking. Tr. 17. The ALJ also rejected the opinion of Dr. Brady because "it lack[ed] sufficient rationale and is inconsistent with the evidence of record as a whole." Tr. 18.

Based on the above residual functional capacity and the testimony of a vocational expert, the administrative law judge at step five of the sequential evaluation process found that Shore could perform unskilled, sedentary work as an addresser, and that there were a significant number of such jobs in the regional, state and national economies. Tr. 19 and 772-78.

Shore argues that the administrative law judge erred (1) by failing to find at step 3 of the sequential evaluation process that Shore's leg amputation met or equaled the requirements of Listing 1.05B, and (2) by rejecting the opinion of Dr. Brady and Dr. Haq and finding that Shore was capable of performing a range of full-time sedentary work.

The Court has thoroughly reviewed the record in this case and finds no merit in Shore's arguments. The administrative law judge did an excellent job of reviewing Shore's vocational

history and medical records in her decision. Tr. 11-20. Furthermore, the brief submitted by the Commissioner thoroughly reviews the medical and vocational evidence in this case. Doc. 7, Brief of Defendant.                                    .

The purpose of the Listing of Impairments is to describe impairments "severe enough to prevent a person from doing any gainful activity," regardless of age, education or work experience. 20 C.F.R. § 404.1525(a); see also Sullivan v. Zebley, 493 U.S. 521, 532 (1990). The Listings operate as a presumption of disability without further inquiry as to whether the claimant can actually perform prior relevant work or other work available in the local, regional or national economies. Id. To qualify for benefits by showing that an impairment, or combination of impairments, is equivalent to a listed impairment, Shore had the burden of presenting "medical findings equivalent in severity to all the criteria for the one most similar impairment." Sullivan v. Zebley, 493 U.S. at 531; Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987)(stating that it is the claimant's burden to present medical findings that show that his impairment matches or is equal in severity to a listed impairment).

The Social Security regulations require that an applicant for disability insurance benefits come forward with medical evidence "showing that [the applicant] has an

impairment(s) and how severe it is during the time [the applicant] say[s] [he or she is] disabled" and "showing how [the] impairment(s) affects [the applicant's] functioning during the time [the applicant] say[s] [he or she is] disabled." 20 C.F.R. § 404.1512(c).

At step three of the sequential evaluation process, the administrative law judge considered Listing 1.05B which provides as follows:

> 1.05 Amputation (due to any cause).
>
> \* \* \* \* \* \* \* \* \* \* \*
>
> B. One or both lower extremities at or above the tarsal region, with <u>stump complications resulting in medical inability to use a prosthetic device to ambulate effectively</u>, as defined in 1.00B2b, which have lasted or are expected to last for at least 12 months;
>
> \* \* \* \* \* \* \* \* \* \* \*

(Emphasis added). Shore did not meet or equal the requirements of Listing 1.05B because there was no evidence that he had <u>stump complications</u> which resulted in a <u>medical</u> inability to use a prosthetic device to <u>ambulate effectively</u>. The regulations define the phrase "inability to ambulate effectively" as "an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." Id. at § 14.00C6(citing 20 C.F.R. pt. 404, subpt. P, app. 1 § 1.00B2b(1)).

36

Examples of an "inability to ambulate effectively" include needing a walker, crutches, or two canes to walk; not being able to walk a block at a reasonable pace on rough or uneven surfaces; an inability to use public transportation; or being unable to carry out routine ambulatory activities (i.e., shopping, banking, or climbing a few steps at a reasonable pace with the use of a single handrail). Id. (citing id. at (2)).

Shore has proffered no medical opinion, nor has he marshaled the evidence in the record, to support his contention that his condition met or equaled the requirements of Listing 1.05B. No treating or examining physician stated that Shore's impairments singly or in combination with his other impairments met or equaled the criteria of Listing 1.05B.

The administrative law judge relied on the opinion of Dr. Arnold, a state agency physician who reviewed Shore's medical records. The administrative law judge's reliance on that opinion was appropriate. See Chandler v. Commissioner of Soc. Sec., 667 F.3d. 356, 362 (3d Cir. 2011)("Having found that the [state agency physician's] report was properly considered by the ALJ, we readily conclude that the ALJ's decision was supported by substantial evidence[.]"); see also Social Security Program Operation Manual System (POMS) Section DI 24515.013, https://secure.ssa.gov/apps10/

poms.nsf/lnx/0424515013 (Last accessed September 26, 2013) ("The signature of a State agency medical . . . consultant on [specified forms] ensures that consideration by a physician . . . has been given to the question of medical equivalence . . . Other documents, including the Psychiatric Review Technique form . . . and various other documents on which medical . . . consultants may record their findings, may also ensure that this opinion has been obtained . . . When an administrative law judge . . . finds that an individual's impairment(s) is not equivalent in severity to any listing, the requirement to receive expert opinion evidence into the record is satisfied by any of the foregoing documents signed by a State agency medical . . . consultant."). The form completed by Dr. Arnold on June 1, 2010, is sufficient evidence that Shore failed to meet or equal the requirements of any listed impairment.

The administrative law judge reviewed the listings and gave an adequate explanation for finding that Shore did not meet or equal the criteria of a listed impairment.

The social security regulations specify that the opinion of a treating physician may be accorded <u>controlling</u> weight only when it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case. 20 C.F.R. § 404.1527(d)(2); SSR 96-2p. In this case the ALJ gave an adequate

explanation for rejecting the opinion of Dr. Brady. Furthermore, because Dr. Haq was a consultative examiner who only had contact with Shore on one occasion, the ALJ did not have to give Dr. Haq's evaluation controlling weight or more weight than the opinion of Dr. Arnold under the circumstances of this case.

The Court is satisfied that the administrative law judge appropriately took into account all of Shore's physical limitations established by the medical records in setting Shore's residual functional capacity. The administrative law judge concluded that Shore could engage in a limited range of sedentary work. That conclusion is supported by the opinion of the state agency physician, Dr. Arnold.

Review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence. Therefore, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner will be affirmed.

An appropriate order will be entered.


_____
**United States District Judge**

Date: September 27, 2013